Filed 10/8/14  P. v. Bravo CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GEORGE BRAVO,<br><br>    Defendant and Appellant. | B247952<br><br>(Los Angeles County<br>Super. Ct. No. BA331885) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

George Bravo was convicted of two counts of conspiracy to commit murder (Pen. Code,[1] § 182, subd. (a)(1)), and the jury also found that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to further criminal conduct by gang members (§ 186.22, subd. (b)(1).) On appeal, Bravo argues that the evidence was insufficient to support his convictions; seeks an independent review of the determination that portions of the wiretap affidavits should be sealed; and contends that the sealing of facts supporting the wiretaps violated his constitutional rights. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the course of another investigation, the Los Angeles County Sheriff's Department discovered evidence of a large criminal conspiracy to murder Rafael Gonzalez and Ralph Roacho in retaliation for a kidnapping for which they were believed to have been responsible. Through a series of wiretaps, detectives listened to approximately 12,000 telephone calls; they also conducted continuous visual surveillance of the residence of one of the main conspirators.

Bravo was charged with two counts of conspiracy to commit murder. At trial, evidence was presented that Maria Llantada and David Sahagun were the leaders in planning the murders. Llantada, acting at the direction of her incarcerated husband Jack Padilla, a member of the Mexican Mafia, conveyed to Sahagun on October 14, 2007, that of the two targets, Gonzalez was the priority because he was close by and because he was more dangerous than Roacho. Llantada told Sahagun that someone was already "going after" Roacho.

The next day, Sahagun and Llantada talked again. Llantada again emphasized that "the one that's closer," Gonzalez, should be killed as soon as possible. She hoped that having Gonzalez killed would lure Roacho out of hiding. Sahagun was assigned to kill Gonzalez; Bravo was to kill Roacho. The killings were planned for Halloween night.

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2

Llantada told Sahagun that she was going to meet with Bravo (known as "Jokes" or "Joker") and that Padilla wanted Sahagun to get to know Bravo, who was at that point watching intended victim Roacho. She informed Sahagun that Padilla had sent word to Bravo that it was more urgent to kill Gonzalez than Roacho and that Bravo should put the Roacho killing "on hold" if he could be of assistance to Sahagun in killing Gonzalez. Llantada told Sahagun that she would speak privately with Bravo at her house, then "introduce you to Joker and then you and Joker can talk about, about how you want to do it."

The following day, Llantada told Bravo that she was arranging to obtain photographs of certain people for him. Llantada arranged with another conspirator, Yvonne Montes, to obtain a photograph of intended victim Gonzalez. Llantada asked Montes to meet her at a fast-food restaurant with the photograph, explaining that she was going to have her "friends" with her and that she was "sure they would want it ahead of time."

On October 19, 2007, Llantada arranged for Sahagun and Bravo to meet for what was apparently the first time. Sahagun and Bravo had a sit-down conversation on Llantada's front porch, then met with Montes and Llantada at the fast-food restaurant. Montes gave Llantada the photograph of Gonzalez. Llantada and Bravo returned to her residence together. Later that day, Bravo and Sahagun left Llantada's residence in Sahagun's car, and proceeded to drive by Gonzalez's workplace three times at low speed.

Sahagun formed a plan to kill Gonzalez on October 23, 2007, but the attempt failed because Gonzalez did not appear. Sahagun telephoned Bravo that evening to tell him about the failed attempt. Bravo told Sahagun, "[W]e got to get this. We got same plan another day."

On October 26, 2007, Bravo and Llantada spoke on the telephone to confirm the plans for Halloween night. Bravo stated that he would call Sahagun immediately to "start getting ready for the ah, for ah, you know ah, to make sure everything at the pad is ah locked up and stuff so we can party this weekend." Llantada told Bravo, "[W]e got to get this Halloween party going[,] buddy."

3

In a telephone call on October 29, Bravo told Llantada that he was "probably gonna head back toward the house and go do some more research and, uh, just get it done myself." He assured Llantada that his "life is solely dedicated to" protecting her and doing what Padilla wanted. "[S]ome how[,] some way I'll get it done, I promise you." Llantada told Bravo that Padilla's main concern is "C." (Gonzalez's moniker was "Cisco.") Bravo responded, "That's too my main concern then." Llantada repeated that the main concern was "C," and Bravo answered, "I'll probably swing by there and get that."

The following morning, police watched Bravo enter a car that then drove past Gonzalez's home several times, slowing each time it went by the home. Soon thereafter, Bravo telephoned Llantada and told her that he was "sightseeing." He reported that he had seen "Mr. T" in the front yard, and that he looked frightened. Bravo said that if he had only had a "toy, it would have been over with him." According to officers, Mr. T was an enforcer for Gonzalez, and that Bravo meant that if he (Bravo) had had a gun, he would have shot him. Bravo told Llantada that he was going to look into silencers.

On October 30, 2007, Sahagun told Llantada that he would bring a group of people to her home the next day, and that they would have "toys."

On October 31, 2007, Bravo and Llantada spoke at 4:30 p.m. Bravo asked if Sahagun was there yet, and Llantada responded that he was on the freeway. Llantada and Bravo made plans that Bravo would take Sahagun on "a quick tour," and then meet Llantada at 6:00. Taking a tour meant looking for Gonzalez. At 6:21 p.m., Sahagun called Llantada to say that he was stuck on the freeway in traffic. Llantada confirmed that he was not far away and said she would be waiting for him.

The police stopped Sahagun before he reached Llantada's home, and they found an assault rifle in his car. At 6:55 p.m., someone using Sahagun's phone called Llantada to tell her that the police had stopped them. At 7:28 p.m., Llantada instructed Bravo to come to her home.

On November 2, 2007, Bravo talked with Llantada and urged her, "Don't give up. You know what I mean? Never give up though. [']Cause it's not over. It's never over

4

[']til[], [']til[] we win." He asked Llantada to tell Padilla not to worry. He acknowledged that there was a "change of plans," but said, "[T]he ball is still in our court." Bravo told Llantada that he would work to the best of his abilities "[t]o make sure we always stay on top." He assured Llantada that his "main concern" was "what your husband . . . would want," meaning that he would complete the mission of assassinating Gonzalez and Roacho. Llantada and Bravo talked about Sahagun's arrest and Bravo said that he would not have pulled over if he had been in Sahagun's position. He assured Llantada that she and her family could stay at his residence in Corona if things got "too[] heated."

Later that day, Bravo called Llantada to tell her that she could stay with his parents if necessary. He wanted to meet with her so that he could inform her of "what I got in store or what my new plan is." Bravo said that he needed to "get up," meaning to rise in the ranks of the Mexican Mafia. He was waiting for a "toy" from his cousin. The two discussed the need to find out more about Sahagun, including whether he was a snitch.

Bravo contacted Llantada a third time that day to pass on information about the charges against Sahagun, and then a fourth time to tell her that he was trying to track down "[o]ur boy C," who was believed to be traveling in a truck. He told Llantada to contact him if Gonzalez headed that way so that he could "trap him," meaning to kill him.

Bravo was convicted as charged, with the special allegation concerning criminal street gangs found true. He was sentenced to 50 years to life in state prison, with a minimum term before parole of 15 years. Bravo appeals.

## DISCUSSION

### I.    Sufficiency of the Evidence

Bravo argues that his convictions must be reversed because there was insufficient evidence that he agreed with others to murder Roacho and Gonzalez or that he intended to participate in the conspiracy or to commit murder. "In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

5

essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639 (*Jennings*).)

A conspiracy is an agreement by two or more persons to commit an offense with the specific intent to commit the elements of the offense, coupled with an overt act by one or more of the conspirators in furtherance of the conspiracy. (*People v. Jurado* (2006) 38 Cal.4th 72, 120.) Here, there was sufficient evidence from which a reasonable jury could conclude that Bravo conspired to murder Gonzalez and Roacho. In recorded conversations, Llantada stated that Bravo had been assigned to kill Roacho and was watching him, but that he was now instructed to put that on hold because it was more important to kill Gonzalez. Bravo and Llantada then began regular communications as Bravo began to participate in the preparations to kill Gonzalez. Bravo went to Llantada's house, and the next day she was in touch with him about her attempts to obtain a photo of intended victim Gonzalez. Bravo met with Sahagun and Llantada at Llantada's house, then attended the delivery of Gonzalez's photo at the fast-food restaurant. Later that day, he accompanied Sahagun to Gonzalez's workplace. He later scouted Gonzalez's home.

After Sahagun's first attempt to kill Gonzalez failed, he reported the failure to Bravo, who responded that the same plan must be carried out at another time. Bravo promised Llantada that he would "get it done" and proclaimed his loyalty to Padilla. In that conversation, Bravo also mentioned inspecting silencers. After Sahagun was arrested, Bravo attempted to take the lead in planning the murders. He told Llantada that

6

he was trying to obtain a gun, and he encouraged her not to give up. Although there had been "change of plans," he told her that "the ball is still in our court" and that Padilla should not worry. Bravo pledged to Llantada that he would work to the best of his abilities "[t]o make sure we always stay on top." He wanted to meet with her to inform her of his new plans for the killings.

Given this evidence, the jury could reasonably conclude that Bravo was an active participant in the conspiracy to murder Gonzalez and Roacho. Bravo argues, however, that while he may have been aware of the conspiracy and associated with the conspirators, he was not a participant in the conspiracy. As we have already discussed, the evidence was sufficient to permit the jury to conclude that he was an active and fully engaged participant in the conspiracy. "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings*, *supra*, 50 Cal.4th 616 at p. 639.)

## II. Ruling on the Motion to Unseal Affidavits in Support of Wiretaps

In the trial court, Bravo joined in the motion of one of his co-defendants to unseal the affidavits in support of the orders authorizing telephone wiretaps. After an in camera hearing, the trial court ordered partial disclosure of the sealed affidavits but determined that most of the contents should remain sealed. On appeal, Bravo requests that we independently review the transcript of the in camera hearing to determine whether the trial court erred when it refused to order full disclosure of the sealed affidavits.

Whether an informant's identity should be disclosed to a defendant generally depends on whether the informant is a material witness on the issue of guilt. (*People v. Hobbs* (1994) 7 Cal.4th 948, 959 (*Hobbs*).) If the informant did not participate in the crime but only "point[ed] the finger of suspicion" at the defendant, the informant's identity is ordinarily not necessary to the defendant's case and need not be disclosed. (*Ibid.*) Evidence Code section 1041 codifies these principles and generally protects the

7

identity of an informant and the information the confidential informant supplied from disclosure.

All or part of a warrant affidavit may be sealed when disclosure will reveal or tend to reveal the identity of a confidential informant. (*Hobbs*, *supra,* 7 Cal.4th at p. 971 [search warrants]; *People v. Acevedo* (2012) 209 Cal.App.4th 1040, 1050-1052 [*Hobbs* procedures applicable to wiretap warrants].) When a warrant affidavit has been sealed, the trial court should follow certain procedures "to strike a fair balance between the People's right to assert the informant's privilege and the defendant's discovery rights." (*Hobbs*, at p. 972.) If the defendant challenges the issuance of the warrant, the court should conduct an in camera hearing and "determine first whether there are sufficient grounds for maintaining the confidentiality of the informant's identity." (*People v. Galland* (2008) 45 Cal.4th 354, 364.) If there are, the court should then determine whether the sealing of the affidavit, or any part of it, is necessary to protect the informant's identity. (*Ibid.*; *Hobbs*, at p. 972.)

We have examined the sealed transcript of the in camera hearing, as well as the record, including the affidavits in support of the wiretaps and the extension of one wiretap. We find the trial court properly sealed portions of the warrant affidavits to protect the informants' identities. (*Hobbs*, *supra*, 7 Cal.4th at p. 976.)

**III.     Sealing of the Facts Supporting the Wiretaps**

Bravo argues that sealing of documents indicating the confidential informants' identities in accordance with the procedure set forth in *Hobbs*, *supra*, 7 Cal.4th 948, violated his constitutional rights to counsel, to a public trial, and to present an effective defense. As Bravo acknowledges, we are bound to follow the holding in *Hobbs*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.